IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:18-CV-203-FL

| | | |
|---|---|---|
| PRECISION HYDRAULIC CYLINDERS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| MANUFACTURING TECHNOLOGY, INC., | ) ) ) ) | |
| Defendant. | ) | |

This matter is before the court on defendant's partial motion to dismiss for failure to state a claim upon which relief may be granted, directed towards plaintiff's claims sounding in tort, pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE 13). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendant's motion to dismiss is granted in part and denied in part.

**STATEMENT OF THE CASE**

Plaintiff, a North Carolina corporation, commenced this action on October 12, 2018, by filing complaint in the General Court of Justice for New Hanover County, asserting a myriad of tort and contract-based claims. Plaintiff's contract claims include breach of express warranties, breach of implied warranties, and breach of contract claims. The tort-based claims which are the subject of the instant motion include claims for negligence, negligent misrepresentation, fraudulent concealment, and unfair and deceptive trade practices pursuant to North Carolina General Statute § 75-1.1 ("UDTP"). Plaintiff seeks compensatory and punitive damages as well as treble damages

pursuant to plaintiff's UDTP claim. On November 15, 2018, defendant, an Indiana corporation, removed the action to this court, and on December 21, 2018, defendant filed the instant motion, seeking dismissal with prejudice of plaintiff's tort claims, as barred by North Carolina's economic loss rule.

**STATEMENT OF FACTS**

The facts in the complaint may be summarized as follows.

A.   Plaintiff's Business

Plaintiff specializes in the supply of hydraulic cylinders to global equipment manufacturers. Over the last several years, one of plaintiff's biggest customers has been JCB, a multinational construction equipment manufacturer. Plaintiff provides cylinders for use in JCB's machines.

Plaintiff relies on specialty experts in friction welding to machine the cylinders it supplies to JCB from rods and eyes plaintiff supplies. Plaintiff contracts with outside firms to friction weld the rods and eyes together.

B.   Defendant Agrees to Develop Small Platform Weldments[1]

On or around May 5, 2013, plaintiff's vice president of supply chain management, Pete Meriam ("Meriam"), contacted defendant through defendant's website expressing interest in having defendant perform friction welding for plaintiff. Defendant's website states defendant offers "friction welding for any application," and at all relevant times, defendant was a merchant of friction weldments. (Compl. (DE 1-1) ¶ 8).

---

[1] A weldment is a unit formed by welding together an assembly of pieces. Weldment, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/weldment [https://perma.cc/J53C-8EYK]. An assembly is the fitting together of manufactured parts into a complete machine, structure, or unit of a machine. Assembly, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/assembly [https://perma.cc/XB5L-JR3L].

Defendant's business development manager Kenn Frank ("Frank") responded via email on August 22, 2013. Frank told Meriam that to have "an informed answer" to Meriam's question, Frank would need drawings of the parts plaintiff was considering for friction welding, including the material specifications, to which Frank responded,"[f]rom these pieces of information, we will be able to provide advice on the best suited welding technology," also stating "we will be able to provide a product quality and consistency needed for your application." (Id. ¶ 9).

On August 23, 2013, Meriam sent Frank drawings for the rod assembly. This assembly featured a rod with a 45 millimeter diameter, also known as the "small platform" assembly. The drawings specified the materials for both the rod and the eye for the small platform assembly. The rod was to be made of a medium-carbon steel, AISI 1045 steel, while the eye was either to be made of a low-carbon steel, AISI 1018 steel, or AISI 1045 steel.

Based on these drawings, defendant sent a proposal to plaintiff on September 9, 2013, for development of the small platform weldments to be used in the small platform assembly. Defendant offered to take sample sets of rods and eyes for "process development and optimization." (Id. ¶12). Attached to defendant's proposal was a document titled "Terms and Conditions," wherein defendant disclaimed any warranty, express or implied, including implied warranties of merchantability or fitness for a particular purpose, and which included limitation to defendant's liability for failures of its welds. (Id.).

On September 17, 2013, Meriam contacted Frank via email and requested additional information about the testing defendant would perform on the weldments. Frank responded on September 18, 2013, stating "our weld development process does testing, including weld evaluation, sectioning and bend testing." (Id. ¶ 13).

3

On October 3, 2013, plaintiff issued a purchase order ("October 3, 2013 PO") for the development of the small platform weldments. Under the section, "TERMS," plaintiff stated as follows: "PRECISION HYDRAULIC CYLINDERS, INC. TERMS AND CONDITIONS APPLY." (Id. ¶ 14). At the time, plaintiff's terms and conditions provided in relevant part as follows:

> Buyer's acceptance of delivery of products manufactured hereunder shall not relieve Seller of any of its warranty or other obligations hereunder. Payment shall not constitute acceptance.
>
> Seller warrants that all products, materials or work covered by this order will conform to the specifications, drawings, samples, or other description furnished or adopted by Buyer, and will be of good material and workmanship and free from defects. If not ordered to Buyer's design Seller further warrants that they will be merchantable and fit for the purpose intended. Seller will indemnify and save Buyer harmless from any loss, actions, expense, claims, liabilities or damages, including consequential damages incurred as a result of Seller's failure to furnish products, materials or work as warranted.
>
> THIS PURCHASE ORDER SHALL BE A BINDING CONTRACT ACCORDING TO ITS TERMS UPON ACCEPTANCE EITHER BY SELLER'S ACKNOWLEDG[]MENT OR BY DELIVERY TO BUYER OF ALL OR PART OF THE ORDER. NO ADDITIONAL OR DIFFERENT TERMS OFFERED BY THE SELLER SHALL BE OR BECOME PART OF THIS ORDER NOR SHALL THIS ORDER BE MODIFIED WITHOUT BUYER'S PRIOR EXPRESS WRITTEN APPROVAL. Any waiver of strict compliance with any provision hereof shall not be deemed to constitute a waiver of that or any other provision in the future. THIS CONTRACT CONSTITUTES THE ENTIRE AGREEMENT OF THE PARTIES AND THERE ARE NO TERMS OR CONDITIONS OTHER THAN THOSE SPECIFICALLY SET FORTH OR REFERRED TO HEREIN.

(Id. ¶ 15).

With the October 3, 2013 PO, plaintiff also sent its supplier quality requirements, which provide, under the "Quality Guarantee" Section, the following regarding "General Purchase Conditions": "Vendor warrants that all products, materials or services covered by an order will conform to specifications and that production is to latest revision drawings and specified engineering tolerances or other description furnished by us and will be free from defects in material and

4

workmanship." (Id. ¶ 16).

Plaintiff alleges that defendant did not reject or counter plaintiff's terms and conditions or supplier quality requirements and accepted both by performing pursuant to the October 3, 2013 PO.

C.   Defendant Agrees to Develop Large Platform Weldments

On October 8, 2013, Meriam emailed Frank to request a quote from defendant to develop new rod weldments. The rods on these assemblies had diameters of 50, 60, and 65 millimeters, also known as the "large platform" assemblies. Meriam attached to his email to Frank the drawings for the large platform assemblies, including the drawings for large platform weldments to be used in the large platform assemblies with part nos. 3116205 and 3116226.[2]

On December 13, 2013, defendant submitted a proposal to plaintiff to "develop and optimize" the large platform weldments whose materials were specified in the drawings Meriam sent Frank on October 8, 2013. (Id. ¶ 22). Specifically, defendant offered to "develop and optimize weld parameters for each rod diameter-to-eye combination" specified, including for weldment Nos. 3116205 and 3116226. (Id.). The December 13, 2013 proposal also attached defendant's terms and conditions.

Plaintiff submitted a purchase order on August 25, 2014 ("August 25, 2014 PO") for the development and optimization of large platform weldments, as described in the December 13, 2013 proposal. The August 25, 2014 PO stated as follows: "PRECISION HYDRAULIC CYLINDERS, INC. TERMS AND CONDITIONS APPLY." (Id. ¶ 23). Plaintiff's terms and conditions on August

---

[2] No. 3116205 was a large platform weldment comprised of a 65 mm rod, part no. 3116206, and an eye, part no. 3116207. The drawing Meriam sent for part no. 3116207, the eye for the 3116205 weldment, specified two material options: CMC 01-xx-13, AISI 1018 steel, or CMC 01-xx-27, AISI 1045 steel. Likewise, No. 3116226 was a large platform weldment comprised of a 50 mm rod and an eye, and the drawing Meriam sent for this eye also specified two material options: CMC 01-xx-13, AISI 1018 steel, or CMC 01-xx-27, AISI 1045 steel.

5

25, 2014 were the same as those on October 3, 2013. Plaintiff alleges defendant accepted plaintiff's terms and conditions, represented it would undertake to develop and optimize the large platform weldments under the August 25, 2014 PO, and never rejected or countered plaintiff's terms and conditions.

D.	Defendant Extrapolates Data from Small Platform Weldments

After defendant accepted the August 25, 2014 PO, plaintiff sent in sample rods and eyes for defendant to consume in developing and optimizing the large platform weldments, which plaintiff alleges included what Frank told Meriam at the beginning of the parties' relationship, "testing, including weld evaluation, sectioning and bend testing." (Id. ¶ 25). Plaintiff sent only AISI 1045 steel eyes, not AISI 1018 steel eyes, to defendant, to only be used in the development and optimization of the large platform weldment, not in a large platform weldment itself, consistent with the material specifications for the large platform weldments Meriam sent Frank on October 3, 2013.

Plaintiff alleges that instead of actually testing, developing, and optimizing the large platform weldments based on the material specifications called out in the drawings Meriam sent, defendant "took a costly shortcut" and extrapolated the data it compiled during the development of the small platform weldments onto the large platform weldments. (Id. ¶ 27). Plaintiff alleges, therefore, the data on which defendant relied in setting parameters for the large platform weldments was fundamentally flawed.

Plaintiff alleges that based on plaintiff's belief that defendant tested, developed, and optimized the large platform weldments, plaintiff "was induced" to make several substantial production orders comprising of hundreds of large platform weldments. (Id. ¶ 30).

E.	Parties Agree to Shorten Rod Length on Large Platform Weldments

6

On August 7, 2014, after defendant had begun running production orders of weldments for plaintiff, Frank emailed Meriam and requested to schedule a visit to plaintiff's offices in North Carolina to discuss reducing the length of the cylinder rods. Frank claimed that the rod length of the parts plaintiff had been providing were producing unnecessary "flash," or excess molten steel produced as a byproduct of the friction welding process. It was defendant's job to remove the flash before shipping the welded cylinders back to plaintiff.

Plaintiff's representatives met with defendant's representatives in North Carolina on August 21, 2014, to discuss shortening rod length. Defendant approached this issue as a cost cutting measure. Defendant claimed that reducing the amount of excess "flash" would also reduce the cost incurred by defendant in getting the products ready to be shipped. Plaintiff alleges defendant advised that, based on defendant's expertise in the friction welding field, the reduction in rod length would have no effect on the integrity of the welds. Plaintiff agreed to reduce the rod lengths of the weldments to defendant's specifications.

On October 31, 2014, defendant submitted to plaintiff a new proposal for production of large platform weldments, including Nos. 3116205 and 3116226. The October 31, 2014 proposal stated, "All pricing stated here assumes . . . the reduction in pre-weld length on all PIN to reduce the excess flash material as agreed in the August 21, 2014 meeting at PHC." (Id. ¶ 33). The October 31, 2014 proposal included defendant's terms and conditions.

On January 9, 2015, Meriam emailed Frank and defendant's engineer Gabe Hostetter ("Hostetter") the updated drawings for the large platform weldments, which incorporated the rod

7

length changes defendant requested.[3] In this email, Meriam asked defendant to confirm that these changes "get us to the ideal situation they have been working toward." (Id. ¶ 34). Defendant confirmed by email.

Shortly thereafter, in the spring and summer of 2015, plaintiff began placing production orders for the large platform weldments with the shortened rod lengths. Each of the POs plaintiff placed for production of large platform weldments with the shortened rod lengths specified that "PRECISION HYDRAULIC CYLINDERS, INC. TERMS AND CONDITIONS APPLY." (Id. ¶ 35). Plaintiff's terms and conditions in 2015 were the same as those on October 3, 2013 and August 25, 2014. Plaintiff alleges defendant never rejected or countered plaintiff's terms and conditions and accepted these terms and conditions by producing the large platform weldments with the shortened rod lengths pursuant to plaintiff's POs.

F.    Defendant's Large Platform Weldments Begin to Fail Systematically

On November 11, 2015, JCB alerted plaintiff that one of defendant's large platform weldments failed. The eye on large platform weldment No. 3116205 had broken off during testing at JCB's facility. JCB's quality engineer Tavares Malone contacted plaintiff, stating "[w]e need someone here at JCB tomorrow to sort these cylinders. They pose a major safety issue and could cause a fatality." (Id. ¶ 37).

On November 12, 2015, plaintiff generated a product alert and put defendant on notice that it would require defendant's assistance in failure mode analysis. On November 17, 2015, plaintiff sent the failed rod and eye sample to defendant for testing and root cause analysis.

---

[3] For large platform weldment No. 3116205, the rod was shortened from 875 mm to 868 mm due to "required 6.11 mm burn off loss from MTI." (Compl. (DE 1-1) ¶ 34). For large platform weldment No. 3116226, the rod was shortened from 517 mm to 513 mm due to "required 4.1 mm burn off loss from MTI." (Id.).

Meanwhile, another of defendant's welds failed. The second failure was also from large platform weldment No. 3116205.

On November 20, 2015, defendant's chief metallurgist Jim Hoffman ("Hoffman") sent Meriam a preliminary analysis of the failed weld. Defendant discovered a "martensitic band" along the fracture surface of the failed eye, meaning that the hardness of the metal in this area was higher than it should have been. (Id. ¶ 40). Hoffman's preliminary analysis still did not explain why there was increased hardness in the failed weldment. Later that day, plaintiff's quality manager Michael Goff ("Goff") emailed Hoffman and requested defendant's root cause analysis.

Defendant's representatives met with plaintiff's representatives in North Carolina on November 23, 2015 to discuss the cause of the weldment failures. Just prior to the meeting, a third weldment had failed, this time from large platform weldment No. 3116226. Plaintiff alleges that at the meeting it was revealed that defendant had not been following documented nonconforming material procedure, which allowed for undocumented non-conforming material to make its way to plaintiff and JCB.

Plaintiff alleges that defendant admitted that it did not realize that both the rod material and the eye material on the large platform weldments were made out of AISI 1045 steel and that, therefore, the process defendant "developed" for the large platform weldments was defective from inception. Defendant also hypothesized that the failures could have been caused by the reduction in rod length that defendant requested. That same day, Goff re-sent Hoffman plaintiff's supplier quality requirements.

Plaintiff alleges that throughout this process, plaintiff was cooperating with JCB to mitigate damages as much as possible. On December 2, 2015, JCB notified plaintiff that defendant's weld

9

failures would cause JCB to miss its build schedule and could result in a field recall. JCB made a demand on plaintiff for damages relating to defendant's weld failures.

G.      Defendant's Representations and Credible Root Cause Analysis

On December 3, 2015, Goff emailed Hoffman and Hostetter a supplier correction action request and demanded immediate action, as samples from all three failed weldments had already been sent to defendant for evaluation. On December 7, 2015, Hoffman emailed Goff and requested the material specifications for CMC 01-XX-13, AISI 1018 steel, and CMC 01-XX-27, AISI 1045 steel, the materials called for in the drawings Meriam sent defendant on October 8, 2013 for the large platform weldment eyes. Plaintiff sent them again.

On December 8, 2015, defendant sent plaintiff its root cause analysis of the weldment failures. In this report, defendant admitted that it did not actually develop and optimize the large platform weldments, and that defendant only ran bend tests on the large platform weldments after applying data it extrapolated from the small platform weldments. Plaintiff alleges that in the report defendant falsely claimed that "the information provided with the eyes purchased by Plaintiff and supplied to Defendant did not identify the material, or identify any changes from the original development materials." (Id. ¶ 49).[4]

Defendant blamed the failures on the fact that the rod eyes were made of AISI 1045 steel. Defendant posited that "re-development using both 1018 and 1045 eye material of each product is necessary to establish process to mitigate untampered martensitic formation along the weld interface for the different material grades," which plaintiff alleges is what plaintiff had already paid defendant

---

[4]     Plaintiff alleges there was no "change" from the "original development materials," the drawings Meriam sent on October 8, 2013 specified AISI 1045 steel eyes, and plaintiff sent defendant AISI 1045 steel eyes to develop and optimize the large platform weldments.

10

to do under the August 24, 2014 PO. (Id. ¶ 51). Plaintiff alleges that had defendant performed, it would have known to develop both materials, because both were called out in the drawings plaintiff sent defendant on October 8, 2013. Defendant included no mention of rod length reduction in its root cause analysis.

On December 14, 2015, Meriam emailed Hoffman to explain that plaintiff disputed defendant's root cause analysis. First, Meriam noted that plaintiff paid defendant to separately develop large platform weldments, and the only material ever supplied to defendant for the large platform weldments was AISI 1045 steel. This included the materials plaintiff sent to be consumed in the development and optimization process. Plaintiff never supplied AISI 1018 steel for a large platform weldment. Meriam also noted that the large platform weldments with AISI 1045 steel eyes had been performing perfectly until defendant changed the rod length. Defendant admitted at the November 23, 2015 meeting that rod length reduction could have caused the failures, but did not address this variable in its root cause analysis. Plaintiff requested that defendant reassess its root cause analysis with these considerations in mind.

Defendant responded on December 17, 2015. Defendant claimed its root cause analysis had not been finalized because plaintiff did not share all relevant information, but plaintiff alleges defendant did not specify what information was missing. Defendant disclaimed all responsibility for testing the large platform weldments. Defendant claimed, plaintiff alleges inaccurately, that the large platform weldment drawings specifying AISI 1045 steel eyes were not provided to defendant until December 7, 2015. Defendant said that "if PHC would have notified MTI of the material[] change to 1045 steel, we could have developed the weld process differently." (Id. ¶ 55). Plaintiff alleges that in this response defendant again did not consider rod length as a potential cause of the

11

failures. Plaintiff alleges the rod length changes were the cause of the weldment failures.

On May 2, 2016, plaintiff issued a written demand letter to defendant pursuant to plaintiff's terms and conditions. Plaintiff demanded that defendant indemnify and hold plaintiff harmless for any and all costs associated with the failed weldments. Plaintiff also noted that its costs would continue to increase as the corrective measures it was undertaking with JCB moved closer to resolution. Defendant rejected plaintiff's demand on May 9, 2016.

Plaintiff alleges it has incurred substantial costs stemming from replacement parts, airfreight charges, testing services, business interruption costs, warranty credit for suspect units, inventory loss, and travel.

**COURT'S DISCUSSION**

A. Standard of Review

To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B. Analysis

"North Carolina's economic loss rule provides that 'ordinarily, a breach of contract does not

12

give rise to a tort action by the promisee against the promisor.'" Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 164 (4th Cir. 2018) (quoting N. Carolina State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 240 (1978)).[5] Under this rule, a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract." Id. (quotations omitted). "It is the law of contract, not tort law, which defines the obligations and remedies of the parties in such a situation." Id. (quotations omitted). "Accordingly, 'North Carolina law requires' courts 'to limit plaintiffs' tort claims to only those claims which are identifiable and distinct from the primary breach of contract claim.'" Id. (quoting Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998); Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 330 (4th Cir. 1994). The economic loss rule "prohibits recovery for purely economic loss in tort when a contract, a warranty, or the UCC operates to allocate risk." Severn Peanut Co. v. Indus. Fumigant Co., 807 F.3d 88, 94 (4th Cir. 2015) (citation omitted).

Plaintiff's negligence claim is subject to dismissal under the economic loss rule, because this claim is not independent, identifiable, and distinct from plaintiff's breach of contract claims.[6] The

---

[5] Defendant basis its motion to dismiss under North Carolina law. Plaintiff states that "[f]or purposes of responding to MTI's motion, PHC assumes, but does not concede, that North Carolina law applies to these issues." (DE 18 at 11 n.2). Thus, the court applies North Carolina law.

[6] Plaintiff argues there where "the existence and terms of an enforceable contract remain in dispute," it is premature for the court to consider the economic loss rule, citing cases where the existence of a contract was in dispute. (DE 18 at 12); see, e.g., USConnect, LLC v. Sprout Retail, Inc., No. 17 CVS 2554, 2017 WL 1450593, at *6 (N.C. Super. Apr. 21, 2017) ("Sprout contends, for example, that the Agreement protects only Sprout's trade secrets and may not be enforced because it expired in 2015 . . . . Given these disputes regarding the application of the contract to the alleged wrongdoing, the Court cannot conclude that the economic loss rule applies to the claim for trade secret misappropriation."); RCJJ, LLC v. RCWIL Enterprises, No. 14 CVS 3392, 2016 WL 3850403, at *7 n.61 (N.C. Super. June 20, 2016) ("Since there exists issues of fact that create a question as to whether the Separation Agreement is an enforceable contract, Defendants' argument that Plaintiffs' fraud claims are barred by the economic loss rule also must fail."); In re KGC Homeowners, Inc., No. 16-01062-5-JNC, 2017 WL 3405509, at *3 (Bankr. E.D.N.C. Aug. 8, 2017) (holding economic loss rule did not bar plaintiff's tort claims where there was "the possibility of no contract claim in the case"). Here, however, although the parties dispute "the scope of MTI's alleged responsibility," (DE 18 at 2 (citing DE 14 at 3 n.1)), the parties do not dispute the existence of a contract. Additionally, plaintiff has put forth no argument or case law in support of its contention that the parties did not enter into an enforceable contract and has alleged otherwise.

conduct that forms the basis of plaintiff's negligence claim is the same conduct that forms the basis of plaintiff's breach of contract claims. Specifically, plaintiff alleges that defendant created and provided weldments that, in a variety of ways, were defective and not "reasonably safe for the purpose and use for which they were intended." (Compl. (DE 1-1) ¶ 82). These are the same actions undergirding plaintiff's breach of contract claims, where plaintiff alleges defendant "breached these express warranties because the weldments failed to conform to the express warranties made," where "the weldments were not merchantable, were not fit for the ordinary purposes for which such goods are used, and were not fit for the particular purpose for which they were used," and where defendant "fail[ed] to develop and optimize the large platform weldments." (Id. ¶¶ 64, 72, 77).

Similarly, plaintiff alleges defendant owed a duty to plaintiff to "exercise reasonable care in the design, manufacture, formulation, development, optimization, modification, processing, testing, warning, instructing, packaging, labeling, distributing, advertising, marketing, and/or promotion of the weldments at issue." (Id. ¶ 81). However, plaintiff does not identify how this duty is not the same duty owed by defendant under the terms of the parties' agreements. See Legacy Data Access, 889 F.3d at 164 (citing Rountree v. Chowan Cty., 796 S.E.2d 827, 831 (N.C. Ct. App. 2017)) ("A 'tort action must be grounded on a violation of a duty imposed by operation of law,' not a violation of a duty arising purely from 'the contractual relationship of the parties.'").[7]

---

[7] The court additionally rejects plaintiff's argument that where, as here, plaintiff has pleaded negligence in the alternative, the court should reject the economic loss rule. Cases cited by plaintiff are inapposite. See, e.g., Edwards v. Vanguard Fiduciary Tr. Co., No. 18 CVS 2818, 2018 WL 6843415, at *9 (N.C. Super. Dec. 21, 2018) ("Because Vanguard has not yet filed an answer, and because in its briefing on the Motion Vanguard disputes the existence of the alleged contract, the Court concludes that it would be premature to dismiss Plaintiff's negligence claim at this time. While Plaintiff's breach of contract claim and negligence claim are inconsistent with one another and implicate the economic loss doctrine, both are able to go forward."); see also Mayfair Northwoods, LLP v. Klimavicz, No. 5:07-CV-179-H, 2008 WL 11431046, at *3 (E.D.N.C. Mar. 27, 2008) (holding "[w]hether plaintiffs must at some point make an election between their contract and tort claims is not for the court's consideration," at motion to dismiss

Likewise, plaintiff's claim for negligent misrepresentation is barred. Plaintiff alleges defendant owed plaintiff a "duty to exercise reasonable care or competence in obtaining or communicating information about the changes in rod length of the weldments," (Compl. (DE 1-1 ¶ 86), arguing that plaintiff has not alleged such duty was to be taken under the terms of the parties' agreements and that such a duty arises under common law, (DE 18 at 16).

However, such duty was to be taken under the parties' agreement as currently alleged by plaintiff. Plaintiff alleges that each of the purportedly defective weldments incorporating the new rod length was provided pursuant to new POs, and plaintiff claims the alleged failure of those weldments as contract and warranty damages. (See id. ¶ 64 (alleging that the failure of the weldments was a breach of an express warranty); id. ¶¶ 66, 74, 79 (contending that defendant had a duty to cure its alleged breaches of warranty and contract "after discovery of the failure in the weldments")). In effect, plaintiff alleges that defendant did not perform as promised under the POs, when 1) defendant "explicitly advised PHC that, based on their expertise in the friction welding field, the reduction in rod length would have no effect on the integrity of the welds," (id. ¶ 32), 2) defendant's welds failed, and 3) this failure is alleged to have been caused by the new rod length.[8] Here, plaintiff's negligent misrepresentation claim and breach of contracts claims are based on the

---

stage, where "it is not clear from the face of plaintiffs' complaint that the economic loss doctrine bars plaintiffs' claims for negligence, negligent misrepresentation, misrepresentation, fraud or unfair or deceptive trade practices.").

[8] Plaintiff argues that defendant's representations regarding the rod length were not "simply poor contract performance" or "bad design advice," but instead plaintiff "contracted with MTI to weld two premade parts together, not redesign the parts themselves" and that plaintiff did not allege that defendant "had a contractual duty to evaluate the length of PHC's rods." (DE 18 at 17). Although plaintiff argues otherwise, defendant's asserted misrepresentation conduct is not "independent and distinct from the conduct comprising breach of contract," AVX Corp. v. Corning Inc., No. 5:15-CV-543-FL, 2018 WL 4113333, at *10 (E.D.N.C. Aug. 28, 2018), where here, unlike in AVXCorp., whether defendant provided welds as directed under the POs is not a separate question from whether defendant is liable for making misrepresentations as to the integrity of the welds. See id. ("whether defendants performed their remediation and assessment duties under the contract may be a separate question from whether defendants are liable in tort for making misrepresentations in the REC Program Questionnaire Response.").

same actions. Plaintiff's negligent misrepresentation claim is barred by the economic loss rule.

Unlike plaintiff's claims for negligence and negligent misrepresentation, plaintiff's last two claims for fraudulent concealment and violation of the UDTP survive defendant's motion to dismiss. Plaintiff acknowledges that defendant's failure to develop and optimize the large platform weldments in breach of the August 25, 2014 PO, in and of itself, does not constitute fraud. See Legacy Data Access, 889 F.3d at 164 (holding a "tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract"). However, this is not what plaintiff has alleged; instead, plaintiff alleges that defendant's concealing the fact that it did not develop and optimize the large platform weldments induced plaintiff to enter into subsequent contracts with defendant, which in turn resulted in the defective weldments reaching plaintiff's customer and causing plaintiff substantial losses. (Comp. (DE 1-1) ¶¶ 29, 92, 100, 102-106).[9]

More specifically, plaintiff alleges that it "relied on MTI's representations and omissions to its detriment by placing production orders of large platform weldments, after MTI knew of and failed to disclose that MTI did not actually 'develop and optimize weld parameters . . . .'" (Id. ¶ 104). Plaintiff alleges that had it known that defendant did not develop and optimize the large platform weldments under the August 25, 2014 PO, "it would not have placed production orders of large platform weldments." (Id.). Plaintiff alleges that plaintiff "at all relevant times did not know, and was not in a position to know, that MTI . . . extrapolated the date it compiled . . . onto the large platform weldments." (Id. ¶ 99). Further, plaintiff does not allege that defendant was contractually

---

[9] Although defendant has made no argument that plaintiff did not properly plead a claim of fraudulent concealment, arguing only that the claim is barred by the economic loss rule, in order to assert a fraud claim in North Carolina, a plaintiff must demonstrate: 1) a false representation or concealment of a material fact; 2) that is reasonably calculated to deceive; 3) is made with the intent to deceive; 4) does in fact deceive the plaintiff; and 5) damages that result from the false representation or concealment. Anderson v. Sara Lee Corp., 508 F.3d 181, 189 (4th Cir.2007) (applying North Carolina law). In addition, a plaintiff must reasonably rely on the false representations. Id.

obligated to tell plaintiff that it developed and optimized the large platform weldments under the August 25, 2014 PO or that defendant's failure to do so constitutes breach of contract.

Here, taking facts in light most favorable to plaintiff, plaintiff has sufficiently alleged a fraud claim that is identifiable and distinct from plaintiff's breach of contract claims. See Legacy Data Access, 889 F.3d at 164; see also Food Lion, LLC v. Schuster Mktg. Corp., 382 F. Supp. 2d 793, 800 (E.D.N.C. 2005) (holding that the economic loss rule did not bar a fraud claim where the allegations, accepted as true, "constitute more than an assertion that plaintiff failed meet its obligations under the contract"); Brooks v. Construction Co., 253 N.C. 214, 219 (1960) (holding where material facts are available to the vendor alone, he or she must disclose them).[10]

Likewise, North Carolina law prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. 75-1.1. Plaintiff's UDTP claim is not barred by the economic loss rule for the same reasons as stated above regarding plaintiff's claim based in fraud. See Hardy v. Toler, 288 N.C. 303, 309 (1975) ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts"); Bhatti v. Buckland, 328 N.C. 240, 244 (1991) (citing Hardy, 288 N.C. at 309) ("Because the presence of fraud is undisputed, defendant's acts were 'unfair or deceptive.'").[11]

---

[10] Defendant argues that plaintiff's allegations do not support plaintiff's argument that defendant failed the common law duty to disclose material facts, particularly where plaintiff does not allege that defendant lied to plaintiff nor took affirmative steps to conceal its methodology for developing and optimizing the large platform weldments. (DE 24 at 9). However, "it is settled law in this jurisdiction that when the circumstances make it the duty of the seller to apprise the buyer of defects in the subject matter of the sale known to the seller but not to the buyer, suppression of the defects constitutes fraud." Ragsdale v. Kennedy, 286 N.C. 130, 140 (1974)

[11] Defendant further argues plaintiff has failed to state a claim regarding plaintiff's UDTP claim. "In order to establish a violation of N.C.G.S. § 75–1.1, a plaintiff must show: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) which proximately caused injury to plaintiffs." Gray v. N. Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68 (2000). For reasons stated above, where plaintiff has sufficiently pleaded a fraudulent act of defendant's, that was in or affecting commerce, which caused plaintiff injury, defendant's argument fails.

Viewing the facts in light most favorable to plaintiff, the court concludes that the economic loss rule does not bar plaintiff's fraudulent concealment and UDTP claims; however, plaintiff's negligence and negligent misrepresentation claims are so barred and dismissed without prejudice.[12]

**CONCLUSION**

Based on the foregoing, defendant's motion to dismiss (DE 13) is GRANTED IN PART and DENIED IN PART. Plaintiff's claims for negligence and negligent misrepresentation are dismissed without prejudice. Plaintiff's fraudulent concealment and UDTP claims are allowed to proceed.

SO ORDERED, this the 13th day of September, 2019.

LOUISE W. FLANAGAN
United States District Judge

---

[12] Although defendant seeks dismissal of plaintiff's tort claims with prejudice, as this court has previously held, "unless the grounds for dismissal clearly indicate that no amendment in the complaint could cure the defects in the plaintiff's case," then dismissal without prejudice is required with opportunity for plaintiff to seek leave to amend. Dillon v. Leazer Grp., Inc., 374 F. Supp. 3d 547, 562 (E.D.N.C. 2019) (citing Goode v. Cent. Virginia Legal Aid Soc'y, Inc., 807 F.3d 619, 623 (4th Cir. 2015); Hancock v. Americo Fin. Life & Annuity Ins. Co., 723 F. App'x 241, 242 (4th Cir. 2018) (dismissing appeal and remanding case for amendment of complaint, where district court dismissed breach of contract and tort claims for failure to plead sufficient facts in the complaint and due to economic loss rule)).